1999 OK CR 52

**Jose Flores FLORES, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F 98–49.

Court of Criminal Appeals of Oklahoma.

Dec. 29, 1999.

Robert Ridenour, Sid Conway, Assistant Public Defenders, Tulsa, OK, Attorneys for Defendant at trial.

Mark Collier, Chad Greer, Assistant District Attorneys, Tulsa, OK, Attorneys for the State at trial.

Barry L. Derryberry, Assistant Public Defender, Tulsa, OK, Attorney for Petitioner on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Diane L. Slayton, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## *O P I N I O N*

LILE, Judge:

¶ 1 Appellant Jose Flores Flores was convicted of First Degree Murder, 21 O.S.1991, § 701.7, after a jury trial in the District Court of Tulsa County, Case Number CF–92–4472, before the Honorable E.R. Turnbull, District Judge.[1] In accordance with the jury verdict, Judge Turnbull sentenced Flores to life without the possibility of parole. From this judgment and sentence Flores has perfected his appeal.

### *FACTS*

¶ 2 On Saturday, October 10, 1992, at around 11:30 p.m. Flores was picked up by Glen Trumbull, Denny Childress and Danny Alverez. After a night of partying, the group stopped at a convenience store at 11th and Utica in Tulsa, Oklahoma. Flores began talking with Sheila Brown. Flores asked Trumbull if he would take him and Brown to Flores' apartment.

---

1. This was Flores' second trial on this charge. His first conviction was reversed and remanded for a new trial in *Flores v. State,* 1995 OK CR 9, 896 P.2d 558, *rehearing denied,* 1995 OK CR 31, 899 P.2d 1162, *cert. denied,* 516 U.S. 1002, 116 S.Ct. 548, 133 L.Ed.2d 450 (1995).

¶ 3 Trumbull took Flores and Brown to Flores' apartment around 5:00 a.m. He waited outside for about twenty minutes. Trumbull then went up to the apartment and knocked on the door, but received no response. After several minutes, Alverez walked up to the apartment to see what was going on, and still no one answered the door. The group left and later returned at about 6:30 a.m. Trumbull saw a light come on in the living room, but no one came out of the apartment.

¶ 4 On October 11th, at about 10:30 p.m., Jerry Conley saw someone carrying a large bag in the alley near Flores' apartment. The next morning, October 12th, Sheila Brown was found in a dumpster in that alley. Her body was concealed in a large garbage bag.

¶ 5 The crotch of Brown's jeans were cut out. She had underwear stuffed into her mouth and a flannel shirt around her neck. Brown's thyroid cartilage was fractured indicating that she had died by ligature strangulation, and her anal opening was torn.

¶ 6 Flores went to work on the 12th. His boss Bob Cypert heard the other employees teasing Flores about having sex during the weekend. He heard Flores say, "[t]hat bitch will never fuck again." That evening Cypert talked to Flores by telephone. Flores asked Cypert for a couple of days wages. Flores said he needed the money because some people were following him. Flores did not show up at work the next day.

¶ 7 Flores was arrested the next morning, Wednesday, on a misdemeanor warrant. He was questioned about the murder and signed a search waiver for his apartment. Flores admitted to dumping Brown's body into the dumpster, but he denied killing her. He said someone named Scott was with Brown during the night and the next morning he found Brown's body in his bedroom. He said he wrapped up her body and carried her to the dumpster. Flores then terminated the interview.

¶ 8 Detectives searched Flores' apartment and found blood stains on the mattress. The blood matched Brown's blood. They also found men's underwear similar to that found in Brown's mouth. Detectives found speaker wire similar to that found wrapped around the garbage bag used to conceal Brown's body. A search warrant was issued for the purpose of recovering bodily samples from Flores. The samples taken from Flores were consistent with swabs taken from the body of Brown.

## ISSUES

¶ 9 In proposition one, Flores complains about a warrantless entry into his apartment by Officer Goree of the Tulsa Police Department. On the day Brown's body was discovered, Goree was summoned by the apartment manager who could speak little English. Goree could not understand most of what the manager was telling him, but the manager was very excited and told Goree that an occupant of the apartment who was usually home every night had not been home on the previous evening. The manager led Goree up to apartment number four where he opened the door. The manager seemed to indicate that something was amiss. Goree followed the manager inside and noticed that the television was on, there were no signs of a struggle, but the bed had no bedding and it appeared that the mattress had recently been turned over. Goree flipped the mattress over and noticed what he believed to be blood stains. Flores was arrested two days later on a misdemeanor warrant. He signed a search waiver for his apartment, and made a statement to the police.

¶ 10 All searches and seizures undertaken without a warrant are presumed to be unreasonable. *Tomlin v. State*, 1994 OK CR 14, ¶ 16, 869 P.2d 334, 338. Arguably, Goree's initial entry into the apartment was made based on exigent circumstances, i.e., his probable cause belief that someone may be in danger in the apartment. But this did not justify Goree's action in turning over the mattress.

¶ 11 Even assuming that the entry into and search of the apartment was illegal, the original taint of impropriety may be removed by intervening circumstances. *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963). "The threshold question in such a case would be

whether the challenged evidence had been obtained by exploitation of the original illegality or by means sufficiently distinguishable to be purged of the primary taint." *Holbird v. State*, 1982 OK CR 130, ¶ 24, 650 P.2d 66, 70. In this case there are sufficient intervening factors to purge any taint originating from the actions of officer Goree. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court in *Brown* cited various factors to consider once the threshold test of voluntariness is met. These factors include (1) the giving of *Miranda*[2] warnings, (2) the "temporal proximity" of the arrest and confessions, (3) the presence of "intervening circumstances," and (4) the "purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

¶ 12 Flores was lawfully arrested based on a misdemeanor warrant after the bloody mattress was found, although officers had intended to speak to Flores about the murder before Goree found the bloody mattress. Flores was informed of his *Miranda* rights. He also signed a *Miranda* rights waiver and a search waiver. The search waiver informed Flores that he had the right to refuse to allow officers to search his premises. There is absolutely no evidence that Flores did not understand what he was signing. Furthermore, Flores was not coerced, threatened or offered any promises for his signature on the rights waiver forms. The discovery of the bloody mattress was not used in any way to form the basis for Flores' arrest or to convince Flores that he should make a statement and sign a search waiver. Therefore, we conclude that the search waiver, evidence obtained as a result of the search waiver, and Flores' statement to police were obtained by means sufficiently distinguishable from the exploitation of any illegality to be purged of any primary taint.

¶ 13 Flores argues in proposition two that his statements to police and consent to search were unlawfully obtained. He argues that the statements and evidence obtained as a result of the statements and search waiver should have been suppressed. Flores first argues that he did not affirmatively waive his *Miranda* rights. He bases this argument on the fact that Detective Parke did not testify that he read Flores the waiver portion of the *Miranda* rights form. However, Flores told Parke that he could read and write the English language, and Flores signed the *Miranda* rights form below the waiver portion of the form. We have determined, based on the totality of the circumstances, that Flores knowingly and voluntarily waived his right to remain silent. *See Le v. State*, 1997 OK CR 55, ¶ 10, 947 P.2d 535, 542–43, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

¶ 14 Flores next contends, in this proposition, that his conviction should be reversed because he was not advised of his rights pursuant to the *Vienna Convention on Consular Relations* (Vienna Convention), Art. 36, para. 1(b), April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261. Both the United States of America and Mexico are signatories to this treaty. The Vienna Convention provides, in relevant part,

> With a view to facilitating the exercise of consular functions relating to nationals of sending states: . . .
>
>> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

21 U.S.T. 77, 596 U.N.T.S. 261, art. 36, para. 1. Flores contends that evidence obtained as a result of his arrest and subsequent statement to police should have been excluded from trial.

¶ 15 Prior to trial, Flores filed a Motion to Suppress alleging, in part, that he was de-

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

nied his right to be informed of his rights under this paragraph. At trial Flores made contemporaneous objections to the introduction of evidence, based on his previous motions. The State did not dispute the allegation that Flores was not informed of this right.

¶ 16 Detective Parke testified at the motion hearing that Flores had a Spanish accent, but he was able to speak and understand English. He testified that Flores told him that he was in this country illegally, but had been here for twelve to thirteen years. Parke knew or should have known that Flores was a foreign national. As a foreign national of Mexico, the Vienna Convention applies to Flores.

¶ 17 Pursuant to the Supremacy Clause of the United States Constitution, federal statutes and treaties are the supreme law of the land. U.S. Const. Art. VI, cl. 2. Acts of Congress are on full parity with treaties. *Breard v. Greene*, 523 U.S. 371, 375, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). However, rights under a treaty and rights under a federal statute are not the equivalent of constitutional rights. *Id.*; see also, *Murphy v. Netherland*, 116 F.3d 97, 100 (C.A.4),*cert. denied*, 521 U.S. 1144, 118 S.Ct. 26, 138 L.Ed.2d 1050 (1997); *Waldron v. I.N.S.*, 17 F.3d 511, 518 (C.A.2, 1993), *cert. denied*, 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994)(holding that rights under Vienna Convention are not the equivalent of fundamental rights, such as the right to counsel).

¶ 18 In order to gain relief from a violation of a statutory right an appellant must show a violation. He must also show that he was prejudiced by such violation. *See Elmore v. State*, 1993 OK CR 1, ¶ 14, 846 P.2d 1120, 1123 ("We will not modify or reverse a sentence or a conviction unless we find not only error, but some prejudicial effect resulting from that error."). Even constitutional violations may be held harmless. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *See Breard v. Greene*, 118 S.Ct. at 1355 ("it is extremely doubtful that the violation [of the Vienna Convention] should result in the overturning of a final judgment of conviction

without some showing that the violation had an effect on the trial.").

¶ 19 Although Flores should have been notified that he had the right to request authorities contact the Mexican consular post, he has failed to show that he was prejudiced by the failure to be so notified. Flores was read his rights pursuant to *Miranda*. Flores voluntarily waived his rights and signed a search waiver for his apartment. He gave no indication that he did not understand what was going on. In fact, during the interview, Flores exercised his right to have counsel present and the interview was terminated. Flores produced no evidence that he would be granted greater protection had he been advised that he had the right to request that the Mexican consular post be notified of his arrest. Further, he presented no evidence that he would have acted differently had he been informed of his Vienna Convention rights.

¶ 20 All evidence indicates that he gave a statement and signed the search waiver knowingly and voluntarily. He has not shown prejudice, therefore this portion of the proposition fails. The statements to police and evidence obtained as a result of the search waiver were properly introduced at trial, regardless of Flores' claims in propositions one and two.

¶ 21 In proposition three, Flores claims that his rights to a fair trial were violated when an excused member of the venire embraced the victim's mother in the presence of the jury. Defense counsel informed the trial court that he saw an excused venireman lingering outside the courtroom. Counsel told the trial court that the ex-venireman approached the mother of the victim and hugged her in the presence of several jurors. Counsel asked for a mistrial.

¶ 22 Flores has not shown that this show of sympathy to the victim's mother, in the presence of the jury, prejudiced him in any way. In *Tate v. State*, 1995 OK CR 24, ¶ 39, 896 P.2d 1182, 1192, jurors were exposed to media reports during an overnight recess during the proceedings. This Court held that without showing prejudice, no relief is required. In *Tate*, the jurors exposed to the

media reports were individually voir dired at defense counsel's request. The jurors unequivocally stated that they could still be fair and impartial. Flores made no such request for individual voir dire in this case. Thereby, he has not met his burden of showing prejudice in this case.

¶ 23 Lastly, in proposition four, Flores argues that he was unfairly prejudiced by the introduction of inflammatory photographs of the deceased. First, Flores complains that two photographs of the deceased showing damage to her anal opening were irrelevant, overly prejudicial and cumulative of each other. These photographs were relevant to show injuries which were sustained just prior to her death. The medical examiner testified that, based on his examination, these injuries occurred prior to death and that they were caused by substantial force. These photographs were relevant to prove that Flores acted with malice aforethought. The photographs also corroborate the medical examiners testimony regarding the injuries. We have long held that the admission of photographs of a deceased are relevant to establish the *corpus delicti*, to illustrate the injuries sustained by the victim, to corroborate expert testimony, and to establish intent. *Robedeaux v. State*, 1993 OK CR 57, ¶ 20, 866 P.2d 417, 425, *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). Furthermore, the probative value of these two photographs was not substantially outweighed by the danger of unfair prejudice and because the photographs show different perspectives of the injuries, they are not cumulative of each other. *See* 12 O.S.1991, § 2403; *Willingham v. State*, 1997 OK CR 62, ¶ 37, 947 P.2d 1074, 1083, *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). Therefore, these two photographs were properly admitted.

¶ 24 Flores next complains about the introduction of a photograph of the deceased taken prior to her death. First we note that the admission of this photograph was not met with a contemporaneous objection. Therefore, we can review for plain error only. *Wisdom v. State*, 1996 OK CR 22, ¶ 34, 918 P.2d 384, 394.

¶ 25 Generally, photographs of homicide victims taken while alive are inadmissible unless they are relevant to some material issue and their probative value is not substantially outweighed by the danger of unfair prejudice. *Tilley v. State*, 1998 OK CR 43, ¶ 32, 963 P.2d 607, 614; 12 O.S.1991, §§ 2402 & 2403. In this case the photograph was relevant for identification purposes. Witnesses, who did not know the victim, saw Flores and the victim together just before the murder. They were able to identify the person in the photograph as the person whom Flores had taken to his apartment. Later, the photograph was identified as that of the victim. The introduction of the photograph was relevant, was not overly prejudicial and thus did not amount to error, let alone plain error.

### CONCLUSION

¶ 26 After thorough consideration of the entire record before us on appeal including the original record, transcripts, briefs and exhibits of the parties, we have determined that Flores' judgment and sentence should be **AFFIRMED.**

JOHNSON, J., concurs.

STRUBHAR, P.J., LUMPKIN, V.P.J., and CHAPEL, J., concur in results.

CHAPEL, JUDGE, concurring in result:

¶ 1 I concur in affirming the conviction and sentence in this case only in reluctant deference to: (1) the United States Supreme Court's confused and illogical harmless error jurisprudence,[1] and (2) that Court's bizarre,

---

1. The Supreme Court's thoughtful effort to put forth a reasoned harmless error doctrine fifty-three (53) years ago in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) has degenerated into fictional distinctions between "structural" and "trial" errors put forth in *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)

and evidence of guilt in *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). The rule today is that virtually any error, constitutional or statutory (and now presumably treaty), can be deemed harmless if the reviewing court believes the record establishes guilt. The due process requirement of a fair trial set forth in our constitution is met,

gratuitous dicta concerning the effect of a violation of a right under a treaty ratified by the U.S. upon a criminal conviction.[2]

¶ 2 Efforts by this Court's majority opinion to determine whether a right created by treaty is a "constitutional right," a "statutory right," or some other kind of right, through some kind of illogical "analysis" in order to find a violation of the right to be harmless is particularly unhelpful. What matters is not what kind of right it is, but rather, what the purpose is behind the right.

¶ 3 Here we have a conceded state violation of notification rights under the Vienna Convention, a treaty signed by the United States The United States, through this treaty, has clearly granted certain specified rights to foreign nationals. The purpose behind those rights is two-fold: i) to afford minimal protections to foreign nationals detained by authorities in this country and ii) to assure minimal protections to United States (U.S.) citizens detained by authorities in foreign countries who are also signatories to the Treaty.

¶ 4 In my judgment, the decision of this Court in this case, and the decision of the United States Supreme Court puts U.S. citizens traveling abroad at risk of being detained without notice to U.S. consular officials. Why should Mexico, or any other signatory country, honor the Treaty if the U.S. will not enforce it? The next time we see a *60 Minutes* piece on a U.S. citizen locked up in a Mexican jail without notice to any U.S. governmental official we ought to remember these cases.

¶ 5 This case has been tried twice. The crime involved is a horrible crime, and there is no doubt as to guilt. After both trials, Flores was sentenced to life without parole.

Does the fact that we know that Flores is guilty of the crime justify winking at a serious violation of the law affecting Flores, and just as important, that might affect U.S. citizens in the future? Why would we do that? Flores is not going anywhere. He is in custody. But for the United States Supreme Court's decision, I would be inclined to reverse and remand this case for a new trial with instructions to comply with the Treaty.[3] This might not be the best solution, but in my view, convictions in this State ought to be obtained without serious violations of the law by the State. Otherwise, the State cannot proclaim to be any better than the person it has charged with violating its laws.

---

notwithstanding serious trial error, according to the Supreme Court, if the record indicates evidence of guilt. *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).

**2.** *See Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529, 538 (1998). "Even were Breard's Vienna Convention claim properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Id.* Of course, *Breard* is a federal habeas case in

which relief was denied on procedural grounds. Here the issue is squarely presented to us. The majority resolves the issue on harmless error grounds.

**3.** I find nothing in this record indicating that the State has ever complied with the Treaty. The State concedes Flores was not informed of his rights under the Vienna Convention, and the officer who originally questioned him testified that he did not inform Flores of his rights under the treaty.